UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TONEISHA MEDINA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-3343 |
| | § | |
| HOUSTON INTERNATIONAL INSURANCE | § | |
| GROUP, LTD., *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court is Defendants Riddhi Chheda and Stephen L. Way's Motions to Dismiss (Docs. 11, 12), Plantiff Toneisha Medina's Response (Doc. 14), and Way's Reply (Doc. 16).  Also pending is Defendants' Motion for Sanctions (Doc. 28), Response (Doc. 30), and Reply (Doc. 32).

**I.     Background**

This is a Section 1981 employment discrimination suit. Medina alleges she was denied a job interview at Defendant Houston International Insurance Group ("HIIG") because of her race. On October 28, 2013, Medina sent her resume to Align Strategic Partners, a hiring agency. Doc. 1-1 ¶ 1. On November 1, 2013 at 10:21 A.M., she received an email from Lisa Broadnax, a staffing manager at Align, stating: "Please call us AS SOON AS you get this message. There is a position that fits your background. I would like to discuss the details. They would like to conduct interviews today. You're my top candidate." Doc. 1-4 at 2. Medina alleges Broadnax also called her by phone and told her it was a "permanent full-time position requiring some overtime and travel," and HIIG "wanted me to start immediately, assuming the interview went well." Doc. 1-1

at ¶ 3–4. Defendant Chheda states in an interrogatory answer she told Align by phone the position was a "direct or temp position; not a full time permanent position." Doc. 30-5 at 3.

At 10:40 A.M., Cheryl Powers, Vice President of Temporary Services at Align, sent Cheddha an email with four attached resumes, including Medina's. Doc. 30-1 at 1. Medina alleges upon information and belief the first two candidates were black. Doc. 30 at 3. Chheda emailed Powers at 2:53 P.M.:

> Hey Cheryl-
> The next two candidates- I'm going to do a phone interview.
> The candidates you're sending are great, but not for this role. Please let me them know what [sic] I will call them at their scheduled time, and if you can provide their phone numbers.
> Appreciate it!

Doc. 30-2. Chheda states: "I never received the candidate's phone number. I did ask for it, but neither Cheryl nor Lisa provided it." Doc. 30-5 at 3. Medina alleges the resume she sent included her phone number. Doc. 1 ¶ 13. On the contrary, Medina's resume, submitted by Defendants and not disputed by Medina, does not include her phone number.[1] Doc. 28-10 at 1. At 2:42 P.M., Medina alleges Chheda called her at her phone number and spoke for three minutes. Doc. 1 ¶ 15. To substantiate this call, Medina has submitted a two-page document consisting almost entirely of white space, with numerous "REDACTED" stamps and eight lines of phone call information including the following entry:

> 11/1/2013  Incoming        2:42 PM  713-935-4800      3

Doc. 1-3 at 3. Medina alleges 713-935-4800 is HIIG's number. Docs. 1 ¶ 4. HIIG does not dispute it. 28 ¶ 8. Medina recounts the alleged phone conversation as follows:

---

[1] The resume also states: "University of Houston, BA of Business/Accounting and Finance." Doc. 28-10 at 2. Subpoenaed records show she did not graduate from the University of Houston. Doc. 28-14 at 3. She has attended Lone Star College but has not graduated. Doc. 28-13 at 7. She has admitted she does not have a BA from the University of Houston. Doc. 28-15 ¶ 17. The resume also states: "Member, AAPA (American Accounts Payable Association), 2010 to Present." Doc. 28-10 at 2. She has admitted she was not a member of the AAPA on November 1, 2013. Doc. 28-15 ¶ 21.

> Ms. Chheda told me about the Executive Assistant position. She told me it required overtime and that I would be working directly with the President of the Company. I told Ms. Chheda that I was excited and would see her at 4:00 p.m. Then Ms. Chheda said "[w]e are an equal opportunity employer, can you tell me a little bit about yourself?" I was a somewhat thrown off by this, since it seemed odd. It was clear from the way Ms. Chheda said that to me that she wanted to know my race. So, I told her, "I am African-American; I have three kids. . . ." At that point, Ms. Chheda cut me off and said "[o]h," followed by an awkward silence. Then, Ms. Chheda said "[w]e will not hire anybody of color." I was stunned by what she said, and just uttered "oh." Ms. Chheda then told me to not worry about coming in for the interview and hung up the phone. I was sitting there in disbelief and shock, and began crying.

Doc. 1-1 at 2–3. As a result of this alleged express discrimination, Medina states she has suffered "[s]leeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, fear of interviewing, fear of being discriminated against in daily life, fear of racism, and loss of appetite, stomach aches, headaches." Doc. 28-9 at 7.

Chheda states the phone call did not occur and she has never spoken to Medina. Doc. 28-7 at 3. HIIG's outgoing phone records do not show the phone call occurred. Doc. 28-5. HIIG's in-house counsel emailed Medina's lawyer on November 7:

> As I mentioned in my voicemail, I have reviewed again our phone records and do not have any outgoing phone calls from our Houston office at 2:42 pm on 11/1. Since you mentioned that you were going to attach Ms. Medina's phone logs to your complaint, I was hoping that you could go ahead and send me that phone log now. I would like to try to do a search of Ms. Medina's number from our phone logs, but do not have it.

Doc. 1-5 at 2. After comparing its own phone logs to the redacted document submitted by Medina, HIIG's information technology staff "attempted various means to delete information from call logs to see if they could trick the phone system. However, the reports consistently showed that this could not be done." Doc. 28 ¶ 10. Nonetheless, Chheda was put on leave and thereafter resigned from HIIG "due to tension, stress, and how uncomfortable work had become as a result of the lawsuit." Doc. 28 ¶ 11. On June 11, 2014, HIIG obtained subpoenaed records

from Medina's phone company, T-Mobile, which also did not show the phone call occurred. Doc. 28-6 at 11. The T-Mobile records include an affidavit from the custodian of records that the records are true and correct. Doc. 28-6 at 9. The T-Mobile records show a three-minute call at 2:42 P.M.:

> 11/1/2013 Spring, TX       2:42 PM 713-377-0001 (F)    3

*Id.* at 11. The entry shows the call is an outgoing call to Spring, TX, rather than an incoming call from HIIG. In regard to the "(F)" notation, at the bottom of the phone record is a legend that states: "Call Type: . . . (F) Mobile2Mobile." Doc. 28-6 at 11. Defendants allege "713-377-0001 (F)" is the number of a family member. Doc. 28 at 7. Medina has refused to admit the phone call from Chheda was fabricated. Docs. 28-15 ¶¶ 3, 10, 11.

At 3:03 P.M., after receiving the alleged phone call from Chheda, Medina alleges she received a phone call from Broadnax at Align, who told Medina

> she had just got off the phone with Ms. Chheda and Ms. Chheda had called her to cancel my 4:00 p.m. interview. Ms. Broadnax explained to me that Ms. Chheda told her that I could not get the job because I am Black, so there was no need for me to go to the interview. Ms. Broadnax said she would call me back. I could tell from her tone of voice that she was very uncomfortable with the situation. I was still crying while on the phone with Ms. Broadnax.

Doc. 1 ¶ 16; Doc. 1-3. At 3:17 P.M., Medina then received a phone call from Powers at Align, who said

> she was so sorry for what happened. Ms. Powers said that she too had talked to Ms. Chheda, and that Ms. Chheda had stated that I could not have the job because I was Black. Ms. Powers told me that this was the first time Align had worked with HIIG and that Align was not going to work with HIIG anymore because Align does not discriminate and because HIIG's conduct was unethical and wrong. Ms. Powers told me that I should obtain a lawyer about what had happened to me, and that she and Lisa Broadnax would testify as to what occurred.

Doc. 1 ¶ 17; Doc. 1-3. On November 4, 2013, Powers sent Chheda an email stating:

> Riddhi,
>
> Good morning. I know we spoke on Friday regarding your open executive assistant role. Based on that conversation I wanted to let you know that Align Strategic Partners will not be a resource for you going forward for temporary or permanent staffing services. Align Strategic Partners sources candidates solely based on their skills and qualifications.

Doc. 30-2 at 1. Neither Broadnax or Powers have submitted affidavits. Medina has submitted a transcript of a voicemail from Rachel Steely, whom Medina describes as "Align's outside legal counsel, a highly respected Partner in the Labor and Employment section of the major law firm Gardere," Doc. 1 ¶ 22. The voicemail states:

> I . . . wanted to let you know that I did interview Cheryl and Lisa. What we've decided is that we're just going to go ahead and let you– give you and HIIG kind of the same information. I'm not going to provide any statements, nor are we going to provide the women for availability for–in order to be interviewed; but they—both Cheryl and Lisa—both did confirm that they were told by the woman at HIIG that they would not hire someone who was black. . . . Both Cheryl and Lisa spoke to her independently, Lisa first and then Cheryl called her back because Cheryl thought it was a misunderstanding; and she said it was not.

Doc. 30-3 at 2.

Defendants deny Chheda told Medina "[w]e will not hire anybody of color" (Doc. 28 at 14), but Chheda herself admits she spoke by phone to Powers about the race of candidates for the position on November 1:

> I told her that I had previously seen white and Hispanics in this role. Cheryl asked if I was discriminating against blacks, and I said no we are not that that is simply what I had seen in the past. I was responding to her question. She then accused me of being racist and again I replied no I am not. Cheryl then insinuated that I was being "discriminatory" and I repeatedly said no I am not. I felt as though she were badgering me to change my answer. I said if anything I was telling her HIIG is diversified. She then accused me again and said she could not believe the company would do that and she hung up on me. Cheryl called back moments later saying the same thing and I kept replying no and the conversation went nowhere.

Doc 30-5 at 3.

On November 4, HIIG received a demand letter from Medina's counsel threatening "career and company-ending litigation" and offering "one chance—and only one chance" to settle within 7 days. Doc. 28-1 at 1. On May 12, 2014, this Court granted Medina's counsel's Motion to Withdraw as Attorney, allegedly at Medina's request. Doc. 19.  HIIG now seeks Rule 11 sanctions against Medina, but not against her counsel,

> because upon Defendants' belief and understanding, she artfully concealed her fraud from her first attorneys who have since withdrawn. Her current attorney has only filed a notice of appearance and responses to request for admission and has not been privy to the underlying documents in the first attorneys file because of technology problems.

Doc. 28 ¶ 19. On June 27, 2014, HIIG served the Motion for Sanctions on Medina 21 days prior to filing, in order to give her an opportunity to dismiss her lawsuit with prejudice. Doc. 28-16. HIIG argues dismissal is appropriate as punishment for squandering resources and as a deterrent, because Medina is "likely judgment proof." and Doc. 28 at 15. Chheda and Way also seek dismissal individually. Docs. 11, 12.

## II.     Discussion

### A.     Motions to Dismiss

Defendants Chheda and Way seek dismissal because they are not individually liable under Section 1981. Docs. 11 at 4. Individual liability under Section 1981 is unsettled in the Fifth Circuit. *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003). Unlike Title VII actions, Section 1981 actions are available against "non-employer defendants" such as individual supervisors and fellow employees. *Id.* at 340 n. 8. Such individuals are liable if they are "'essentially the same' as the [employer] for the purposes of the complained-of conduct." *Id.* at 338. *Foley* stopped short of saying individuals must be "essentially the same" as employers to be liable:

> We recognize that there is a tension between our decisions . . . with respect to the liability of individual defendants who are not parties to the employment contract. However, we do not believe that this is the proper case in which to decide the outer boundaries of § 1981 liability as it applies to individual non-employer defendants, nor to attempt to catalogue every fact situation which might subject an individual to such liability.

*Id.* (internal citations omitted).

Here, Medina alleges both Chheda and Way discriminated against her on behalf of HIIG, a prospective employer. Medina alleges Chheda expressly rejected her candidacy on the basis of race. As for Way, Medina alleges Chheda told her she would be "working directly" with the "President."[2] Doc. 1 ¶ 15. Way argues this alleged statement does not "in anyway [sic] indicate[] WAY was personally involved in any communication or decision regarding Plaintiff." Doc. 12 at 4. On the contrary, it suggests Way was directly involved. The job description provided by Align to Medina states: "Has worked DIRECTLY! For a President of a large company, professional and polished - to the nines." Doc. 1-1 at 6. Chheda admits she told Powers, "The candidate needed previous work experience, working directly with executives, sharp, flexible schedule and able to switch projects without notice. I told her that I had previously seen white and Hispanics in this role." Doc. 30-5 at 4. After interviewing two allegedly black candidates, she emailed Align: "The candidates you're sending are great, but not for this role." Doc. 30-1. This email and the admission by Chheda, which were not attached to the complaint, serve to illustrate Medina's allegation on the face of her Complaint, that she was expressly rejected for a particular position directly working with Way. The allegation permits a reasonable inference, beyond mere speculation, that Way himself communicated a racial preference for a non-black executive assistant. *See Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th

---

[2] Chheda maintains, "I did not reference this position as reporting to the 'President.' I said chairman and/or CEO." Doc. 30-5 at 4. Way admits he is Chairman, CEO, and (at least on regulatory filings) "President" of HIIG. Doc. 13 ¶ 5.

Cir. 2010), quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) ("'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'").

### B.     *Motion for Sanctions*

The discrepancy between the call log attached to Medina's Complaint (Doc. 1-3) and authenticated records from T-Mobile (Doc. 28-6 at 11) raise the disturbing prospect that Medina may have submitted a fraudulent document to the Court. Although Medina denied fabricating phone records in a response to a request for admissions (Doc. 28-15), she did not deny they were fabricated in her response to the Motion for Sanctions, arguing first:

> Even assuming *arguendo* that the subpoenaed records are accurate, Defendants only have raised a credibility issue (not unlike most lawsuits) that must be decided by the trier of fact—not by the Court in a motion for sanctions.

Doc. 30 at 5.

And then:

> Even if Ms. Medina did not have this evidentiary support . . . [i]t is highly likely that Ms. Medina will uncover additional evidentiary support during the course of discovery.

Doc. 30 at 10.

The credibility of the call log attached to Medina's complaint is further undermined by discrepancies between her resume and other subpoenaed records. *See infra*, n. 1. Nonetheless, sanctions for a fraudulent complaint are more properly addressed after summary judgment. Fed. R. Civ. P. 11 advisory committee's notes ("[I]t is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation."). In the meantime, in order to correct and clarify the record for summary judgment and/or trial, Medina is ordered to submit a complete, unredacted version of the phone record attached to her Complaint. Doc. 1-3. If privacy is an issue, she may file the document under seal.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants Riddhi Chheda and Stephen L. Way's Motions to Dismiss (Docs. 11, 12) and Defendants' Motion for Sanctions (Doc. 28) are **DENIED**.

It is further **ORDERED** that Plaintiff Medina submit to the Court a complete, unredacted version of the document submitted as Exhibit 3, Doc. 1-3 ("Usage for: 281-235-7559") within seven (7) days.

SIGNED at Houston, Texas, this 2nd day of February, 2015.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE